IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Richard G. Barlow,

Plaintiff,

vs.

ADS Alliance Data Systems, Inc.,

Defendant.

Case No. 1:02-CV-920

Findings of Fact and Conclusions of Law

1. In 2001, Plaintiff Richard G. Barlow was the principal shareholder of LoyaltyOne, Inc., an Ohio corporation with its principal place of business in Milford, Ohio. LoyaltyOne was the parent company of Frequency Marketing, Inc., another Ohio corporation. LoyaltyOne and Frequency Marketing are referred to collectively herein as "FMI".

2. Defendant ADS Alliance Data Systems, Inc. is a publicly traded corporation with its principal place of business in Dallas, Texas.

3. In 2001, FMI lost more than $600,000 in earnings before interest, taxes, depreciation, and amortization ("EBITDA"). Before 2001, its EBITDA ranged from approximately $400,000 in 1998 to $800,000 in 1999 and $2,900,000 in 2000.

4. In 2001, Plaintiff decided to sell FMI and entered into preliminary negotiations with ADS and other potential purchasers.

5. As part of those preliminary negotiations, Plaintiff provided ADS with financial projections for 2002 showing EBITDA of $9,700,000 on $36,500,000 in revenue.

6. FMI's projections included almost $8,000,000 in revenue from a contract with American Express Travel Related Services, Inc. ("American Express"). At the time of the negotiations in 2001, FMI expected the contract with American Express (the "American Express US Contract") to be executed before the end of 2001 after several previous delays.

7. Based in large part on FMI's financial projections, Plaintiff and ADS reached a tentative agreement for ADS's purchase of FMI in December 2001. That agreement provided for ADS to pay $42,000,000 in cash at closing plus an additional earnout of up to $5,000,000.

8. Before the tentative agreement was finalized in December 2001, American Express notified FMI that it was delaying its decision on the American Express US Contract for four to six weeks.

9. Plaintiff and ADS continued their negotiations and developed a new deal structure to account for the uncertainty surrounding the American Express US Contract.

10. Specifically, the initial cash payment was reduced from $42,000,000 to $26,200,000. An EBITDA Earnout Agreement provided for payment of up to $13,800,000 if FMI achieved $8,300,000 in EBITDA in 2002 and also required ADS to cause FMI to be managed "in the ordinary course consistent with past practices." The EBITDA Earnout Agreement was structured so that the selling shareholders would receive no payment for an EBITDA amount below $5,450,000 and $4.80 for each dollar of EBITDA from $5,450,000 to $8,300,000.

11. The restructured transaction closed on January 10, 2002.

12. After the transaction was completed, certain changes in FMI's operations were inevitable. FMI's operations had routinely changed throughout its history. The mere fact that operations changed in various ways does not establish that FMI was not operated in the ordinary course consistent with past practices.

13. Certain changes that occurred during 2002 were beneficial to FMI; others, while not necessarily beneficial, were inevitable and within the contemplation of the parties at the time of ADS's acquisition of FMI.

14. Such changes included the departure of Plaintiff after twenty years as FMI's president and chief executive officer. While Plaintiff's departure was likely to affect FMI, Plaintiff

testified that, in preparing for FMI's sale, he had tried to prepare FMI to operate without his continued presence.

15. Another inevitable change within the contemplation of the parties at the time of the acquisition was that FMI would be part of a publicly traded corporation with financial reporting requirements imposed by federal law. Plaintiff's claim that ADS violated the acquisition agreement by requiring FMI to produce accurate monthly financial forecasts during 2002 is contradicted by the evidence.

16. Another change resulting from the acquisition was the opportunity for FMI to profit from the use of ADS's client list. One of Plaintiff's first directives to the FMI sales team following the acquisition was to exploit the possibility of selling FMI's services to clients of ADS.

17. Shortly after Plaintiff gave that directive, FMI began exploring opportunities at Limited Brands, Inc. ("The Limited"), one of ADS's largest clients. ADS's relationship with The Limited was managed by CDMS, a division of ADS in Columbus.

18. FMI employees Kelvin Taylor and Pat LaPointe met and communicated with CDMS representatives, including Jeff Quick, to assess the opportunities available at The Limited. Later, CDMS arranged for Kelvin Taylor and Pat LaPointe to meet with senior executives at The Limited in order to further assess opportunities for marketing FMI services to The Limited.

19. As part of this assessment, Kelvin Taylor spent a day in Columbus assessing CDMS's capabilities in the area of analytics, which was Mr. Taylor's area of expertise at FMI. Later, Mr. Taylor prepared an analytics consulting proposal for The Limited that would have generated $500,000 in revenue for FMI.

20. Kelvin Taylor testified that, in total, he spent approximately 120 hours on work related to The Limited and/or CDMS during 2002. Mr. Taylor testified that the $500,000 consulting proposal he prepared for The Limited was never accepted and that the work proposed therein was not performed by FMI.

21. ADS reimbursed FMI for the time Kelvin Taylor spent on the $500,000 consulting proposal and the day he spent assessing CDMS's analytics capabilities.

22. Kelvin Taylor and other FMI personnel also participated in sales calls directed at selling FMI's services to other ADS clients, including Marathon Oil, Conoco-Phillips, 7-11, and Barnes & Noble.

23. Plaintiff claims that FMI's efforts to market its services to ADS clients was not consistent with FMI's past practices. As a result, Plaintiff seeks credit for related travel expenses, revenue credit for sales proposals that were not accepted or performed or, in some cases, credit for both travel

expenses and revenue that was never received from the prospective clients.  The evidence established, however, that those sales efforts were both endorsed by Plaintiff and consistent with FMI's past practices.  Moreover, ADS has identified no basis for crediting FMI with revenue for proposed work that was never accepted or performed.

24.   The EBITDA Earnout Agreement created an inevitable tension between Plaintiff's short term interests and FMI's long term success and financial health.

25.   The parties tried to address this tension in the Spring of 2002 by negotiating an amendment to the EBITDA Earnout Agreement.  Those negotiations failed.

26.   Thereafter, Plaintiff adopted a singular focus on maximizing his earnout by narrowly focusing on FMI's 2002 results.  Plaintiff's effort to focus solely on 2002 performance was not consistent with FMI's past practices.

27.   In an e-mail message Plaintiff sent to members of FMI's management team on June 20, 2002, Plaintiff directed that FMI should maintain a "singular focus on 2002 results."  Conversely, Plaintiff directed that FMI should spend "minimal time on opportunities with little or no EBITDA contribution in 2002" despite the fact that FMI's lead time on sales was frequently as long as twelve to eighteen months.

28. Plaintiff's e-mail message also called for $500,000 in expense cuts during the final six months of 2002 and directed the elimination of "staff cost first." Plaintiff further ordered that FMI should "[s]pend NO money on activities that will not produce revenue this year."

29. FMI's own senior management objected to Plaintiff's proposed cuts, as they notified Michael Beltz, ADS's executive responsible for FMI. With Michael Beltz' approval, FMI's senior management responded to Plaintiff by rejecting the proposed cuts as inconsistent with the principles that had guided FMI during the preceding years.

30. Plaintiff claims that the rejection of the $500,000 in expense reductions he proposed in June 2002 was inconsistent with FMI's past practices. To support his argument, Plaintiff relies upon earlier occasions when layoffs were necessitated by cash-flow problems or the loss of a significant client.

31. No such justification existed for the cuts Plaintiff proposed in 2002. FMI had not lost a large client, nor was it experiencing cash-flow problems. Rather, the proposed layoffs were intended by Plaintiff solely as a means to maximize his potential earnout.

32. After receiving this response from FMI's senior management, Plaintiff resigned from FMI effective June 24, 2002,

and filed this lawsuit in November 2002, before the end of the earnout period.

33. Frequency Marketing and American Express Travel Related Services Company, Inc. ("AESEL") are parties to a Global Rewards Software Development and License Agreement (the "Original AESEL Agreement"), which became effective on November 30, 1999.

34. The Original AESEL Agreement provides for a term of ten years unless it is terminated sooner pursuant to a termination provision.

35. At a point in mid-2002 by which the parties recognized that FMI likely would not reach the threshold EBITDA necessary for Plaintiff to receive a payment under the EBITDA Earnout Agreement, FMI began exploring means by which it might realize more revenue during the EBITDA earnout period from its existing clients.

36. As part of that exploration, a concept was conceived in which certain amendments would be made to the Original AESEL Agreement as a result of which AESEL would make a lump-sum payment to FMI in 2002 and AESEL would receive in exchange for that payment the right to use the source code for FMI's "Licensed Software" as provided in the Original AESEL Agreement, future updates to the Licensed Software at no additional charge to AESEL, and reductions in future transaction fees that would become payable under the Original AESEL Agreement.

37. The parties undertook to negotiate the precise terms of what would become an amendment to the Original AESEL Agreement.

38. ADS and FMI wanted FMI to be in a position to recognize in 2002 the revenue it would receive pursuant to the amendment to the Original AESEL Agreement. To that end, ADS and FMI did all that was within their power to have the transaction that would be represented by the amendment to the Original AESEL Agreement structured in a way that would maximize the chances of FMI being able to recognize in 2002 the revenue it would receive pursuant to the amendment. Moreover, ADS and FMI did all that was within their power to have the amendment executed in 2002.

39. LoyaltyOne, doing business as Frequency Marketing, Inc., as successor to Frequency Marketing, and AESEL are parties to an Amendment to Global Rewards Software Development and License Agreement (the "Amended AESEL Agreement"), which has a stated effective date of December 1, 2002.

40. Despite the best efforts of ADS and FMI and through no fault of ADS, the Amended AESEL Agreement was not executed by AESEL until January 2, 2003.

41. Neither ADS nor FMI did anything to delay AESEL's execution of the Amended AESEL Agreement.

42. Under the terms of the Amended AESEL Agreement, AESEL received the right to use the source code for FMI's "Licensed

Software" as provided in the Original AESEL Agreement. That source code was not delivered to AESEL until January 2003.

43. Under the terms of the Amended AESEL Agreement, AESEL was to pay a lump sum of $3.5 million. That payment was made by AESEL on January 21, 2003, after the expiration of the earnout period under the EBITDA Earnout Agreement.

44. None of the $3,500,000 in revenue received under the Amended AESEL Agreement was recognized in 2002, nor did the agreement pursuant to which ADS acquired FMI from Plaintiff require that it be recognized in 2002. Rather, FMI recognized the lump-sum payment FMI received in January 2003 under the Amended AESEL Agreement as revenue to be recognized ratably over the remaining life of the Original AESEL Agreement beginning in January 2003.

45. While the parties disagree regarding the issue of whether generally accepted accounting principles ("GAAP") permit recognition of revenue derived from sales or licensing of computer software source codes at the commencement of a contract such as the Amended AESEL Agreement, Plaintiff has not attempted to demonstrate the GAAP require such treatment. Furthermore, the question is academic in this case, inasmuch as Plaintiff has made no attempt to demonstrate that GAAP require that such revenue be recognized in the year prior to the execution of the agreement

pursuant to which the sale or licensing occurs and the payment of the fee therefor.

46. The American Express US Contract did not materialize in 2002. As a result, the likelihood that FMI would achieve the necessary EBITDA to support any payment under the EBITDA Earnout Agreement was remote.

47. Although changes occurred at FMI during 2002, such changes were consistent with past changes that had occurred at FMI. Plaintiff has not proved that ADS breached the agreement pursuant to which it purchased FMI from Plaintiff by failing to cause FMI to be operated in the ordinary course consistent with past practices.

48. ADS did not misuse or divert FMI resources to support ADS's own business operations. In particular, FMI's participation in offering services to ADS's clients was undertaken primarily for the purpose of promoting and selling FMI's own services.

49. Plaintiff has failed to establish that any of the alleged deviations from past practices were material and thereby caused FMI to fail to reach the $5,450,000 threshold to support a payment under the EBITDA Earnout Agreement.

50. Under Ohio law, damages for lost profits cannot be remote or speculative but must be proved with reasonable

certainty. See Charles R. Combs Trucking, Inc. v. International Harvester Co., 12 Ohio St.3d 241, Syllabus ¶2 (1984).

51. Plaintiff has also failed to prove his asserted damages with the reasonable degree of certainty required by Ohio law.

52. The issue as to which Defendant's expert witness testified has proved to be academic in the resolution of Plaintiff's claim in this matter. See ¶46. Accordingly, Plaintiff's motion *in limine* to exclude his testimony (Doc. 26) is **MOOT**.

53. The Court hereby **DIRECTS** the Clerk of this Court to enter judgment in favor of Defendant and to close this matter on this Court's docket.

**IT IS SO ORDERED.**

/s/
Sandra S. Beckwith, Chief Judge
United States District Court